### BAGLIN v. CUSENIER CO.

(Circuit Court, S. D. New York. November 18, 1907.)

**1. TRADE-MARKS AND TRADE-NAMES—NAME SUBJECT TO APPROPRIATION—"CHARTREUSE."**

The name "Chartreuse" is not a place name, but a French term denoting a Carthusian monastery, and is a proper subject of appropriation as a trade-mark. In the United States it has been long and widely known and is registered as a trade-mark denoting a liqueur made and sold by the Carthusian monks.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 46, Trade-Marks and Trade-Names, § 13.

Use of geographical names, see notes to Hoyt v. J. T. Lovett Co., 17 C. C. A. 657; Illinois Watch Co. v. Elgin Nat. Watch Co., 35 C. C. A. 242.]

**2. SAME—INFRINGEMENT—INJUNCTION.**

For many years the order of Carthusian monks established at La Grande Chartreuse, in France, made and sold a liqueur under the name "Chartreuse," claimed to have been made by a secret process. Such liqueur has long been sold and has become well known under such name in the United States, where the name is registered as a trade-mark. The order having been expelled from France by the government, a receiver was appointed who took possession of their property, including their liqueur factory and, as it appears, their trade-mark. Such receiver, although having no knowledge of the secret formula, commenced the manufacture of a similar liqueur, which he sold under the name "Chartreuse," using the same bottles and labels as had been used by the monks. In the meantime, the monks established a factory in Spain and continued to manufacture the liqueur in accordance with the original formula, using, however, a different label and style of package. *Held*, that the action of the French government and court did not affect the trade-mark rights of the Carthusian monks in the United States; that such rights were not dependent on the place or country in which their business was conducted; that the receiver did not succeed to such rights, but became their competitor; and that they were entitled to an injunction restraining the sale of his products in this country in competition with their own under their trade-mark and dress and as the original and genuine Chartreuse.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 46, Trade-Marks and Trade-Names, § 110.

Unfair competition, see notes to Scheuer v. Muller, 20 C. C. A. 165; Lare v. Harper & Bros., 30 C. C. A. 376.]

In Equity. Suit for infringement of trade-mark.

For decision on preliminary injunction, see 156 Fed. 1015, which was reversed by the Circuit Court of Appeals in 141 Fed. 497.

Philip Mauro, C. A. L. Massie, and Ralph L. Scott, for complainant. Howson & Howson, for defendant.

HOUGH, District Judge. Prior to 1901, the Carthusian monks, of whom the complainant herein is the Father Superior, conducted a manufacture of liqueurs near their chief monastery and not far from

Grenoble, France. The history of this business is sufficiently set forth in Bauer v. Order of Carthusian Monks, 120 Fed. 78, 56 C. C. A. 484, and it is for the purposes of this case sufficient to state that the evidence herein supports the statement of fact there made.

In the United States, the liqueurs in question have long been known, traded in, and consumed by the name "Chartreuse." This word is not a place name, and never was. It is the French term for a kind of building, i. e., a Carthusian monastery; but for American commercial purposes it means, and long has meant, a certain drinkable manufactured by that branch of the Carthusian order living near Grenoble in La Grande Chartreuse, i. e., the monastery occupied by the Father Superior. Cf. Siegert v. Gandolfi, 149 Fed. 100, 79 C. C. A. 142; Bauer v. Siegert, 120 Fed. 81, 56 C. C. A. 487.

On July 2, 1901, the French "Loi relative au contrat d'association" became effective. By that statute the ecclesiastical association which had for hundreds of years occupied the Grande Chartreuse, and for a considerable fraction of that time manufactured liqueurs near by, became unlawful. Under French law the effect of such illegality was to disable the association as a legal entity, or any trustee (personne interposeé) for the associators, either to obtain or retain property for association purposes. In order, therefore, to conserve such property for the persons entitled thereto, a receiver (liquidateur) was appointed, who seized what he could discover, including the liqueur factory near Grenoble. The persons entitled to the seized property, parts of which seem to have belonged to the order for centuries, do not appear in the evidence, further than that neither the individual monks nor any of them were so entitled, unless it should ultimately be directed either by judicial or legislative action that the proceeds of the sale of the seized property be applied to defray such pensions as might be payable or thereafter granted to indigent surviving monks.

This exposition of the law of France is given by defendant's witness M. Millerand, Minister of Commerce at the time the law was enacted, a member of the Chamber of Deputies, an attorney at law and counsel for the receiver. It does not appear that the receiver ever obtained any judicial authority to continue or revive the business of manufacturing liqueurs, nor is it clear that French law requires such authorization. Before the receiver assumed possession the monks had departed, leaving behind as little as possible, and especially taking with them all certain knowledge of the formula or recipe for their liqueurs. The receiver, however, seems under the law of France to have become possessed of the trade-mark "Chartreuse," although he found no business to accompany it and had no ability to make, or knowledge of making, the article covered by such trade-mark. He thereupon employed men of science, who by analysis and experiment produced a liqueur which may be identical with, and certainly closely resembles, the monkish cordial, and this he sold under the same labels and in the same bottles as had long been used by the Carthusians. Thus the liqueur of the receiver, whose title is that of the defendant, is in appearance and style of wrapping identical with that of the monks, solely excepting the mark of the printers of the label, in which particular a variance exists, but only because the firm which had printed for the complainants re-

fused the receiver's repeatedly proffered trade. The Carthusians, being thus dispossessed, removed their ecclesiastical establishment to Italy, but set up in Spain their cordial factory, importing from the neighborhood of Grenoble certain herbs locally grown and constituting one of the known ingredients of their liqueurs.

This action is brought, in substance, to enjoin the receiver's assignee from vending the liqueur in the United States under the old labels, and the defense has two branches: First, that the French proceedings above outlined have vested in defendant title to the old trade-mark; and, second, that the complainants have either abandoned such trademark or estopped themselves from asserting it by the course and conduct of their business in Spain.

The first defense rests upon the assumption that what was done in France did or could possess extraterritorial validity, or affect any property of complainants in the United States. It is not denied that on July 2, 1901, complainants possessed a valuable asset in this country, i. e., the right to vend their produce under certain brands and labels and in bottles of certain size, shape, and marking, which right had long existed, had received the recognition of federal trade-mark registration, and been vindicated in our courts. Bauer v. Order of Carthusian Monks, supra; Grezier v. Gerard, unreported and decided in this court April 13, 1876.

This American property did not pass to the receiver, and could not inure to his benefit or that of his assignee by any proceeding taken against complainants in France. Some strength might be found in defendant's argument had the receiver become possessed of the business that produced the product indicated by the trade-mark. This he did not do. A business does not inhere in a place or a building, nor depend for validity upon continuance in one locality or country. When the monks fled from the rigor of French law, they took their business with them. The testimony shows that it exists to-day in Spain, and, while they continue to transact it there or elsewhere, no law but that of the United States can deprive them of the lawful fruits thereof in this country.

The second defense is based upon the admitted fact that, finding the French market for Chartreuse made in Spain and bearing the old labels closed to them by French law, complainants devised a new form of package, wholly unlike the old, and have for some years pressed that upon the market both in Europe and America, at the same time warning the public by advertisement that the old label and bottle no longer denotes the genuine Chartreuse of the Carthusians. This is all true, with the addition that complainants have taken care to put up some liqueur under the old label and vend it, in order to negative intentional abandonment while litigations more or less resembling this cause have been pending in most countries other than France.

The defense now under consideration is affected by the same fallacy as the first, viz., the thought that the liquidateur is the successor of the monkish industry. Nothing could be further from the truth. He and all claiming under him are rivals in business, enjoying the advantage of governmental protection in the country of his appointment. If one entitled to a trade-mark does abandon it, that does not justify a rival

in appropriating the same and using it to induce the public to believe that the rival's product sold under the old label is the same thing so long and favorably known thereunder and still being sold under the new label by the original proprietor. The result of a suit to enjoin such competition cannot I think be doubted. The only difference between the case supposed and that at bar is that the rival's right to the label and the use thereof arises from the coercion of a foreign statute and proceedings thereunder, with which from a foreign point of view we are not concerned, but which by every canon of American law amount to confiscation.

Decree for complainants.